442 F.2d 159
 The CONTRACTORS ASSOCIATION OF EASTERN PENNSYLVANIA
v.
The SECRETARY OF LABOR, George P. Shultz, the Assistant Secretary of Labor, Arthur A. Fletcher, the Director, Office of Federal Contract Compliance, John L. Wilks, the Secretary of Agriculture, Clifford M. Hardin, and the General State Authority of the Commonwealth of Pennsylvania.
James D. Morrissey, Inc., the Conduit & Foundation Corp., Glasgow, Inc., Buckley & Company, the Nyleve Company, Erb Engineering & Constr. Co., Perkins, Kanak, Foster, Inc., and Lansdowne Constructors, Inc. (Intervening Plaintiffs in D. C.).
The Contractors Association of Eastern Pennsylvania, James D. Morrissey, Inc., the Conduit & Foundation Corp., Glasgow, Inc., Buckley & Company, the Nyleve Company, Erb Engineering & Constr. Co., Perkins, Kanak, Foster, Inc., and Lansdowne Constructors, Inc., Appellants.
 No. 19027.
 United States Court of Appeals, Third Circuit.
 Argued March 1, 1971.
 Decided April 22, 1971.
 
 COPYRIGHT MATERIAL OMITTED John J. McAleese, Jr., Synnestvedt & Lechner, Robert J. Bray, Jr., Philadelphia, Pa., for plaintiff and intervening plaintiffs-appellants.
 David L. Rose, Civil Right Division, Planning and Special Appeals Section, Department of Justice, Washington, D. C., Peter Nash, Solicitor of Labor, Gerald L. Paley, Associate Solicitor of Labor, Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., Louis C. Bechtle, U. S. Atty., Bernard H. Shapiro, Joseph B. Scott, Attys., U. S. Department of Justice, Washington, D. C., for federal appellee.
 Theodore R. Mann and Barry E. Ungar, Philadelphia, Pa., amicus curiae, for appellees; Goodis, Greenfield, Narin & Mann, Philadelphia, Pa., of counsel.
 Winthrop A. Johns, Lawrence T. Zimmerman, Washington, D. C., for Associated General Contractors of America; Reilly, Johns & Zimmerman, Washington, D. C., of counsel.
 Nathaniel R. Jones, General Counsel, Paul J. Spiegelman, New York City, Russell Specter, Washington, D. C., William D. Wells, amici curiae, for NAACP; Robert J. Reinstein, Philadelphia, Pa., of counsel.
 Sherman, Dunn & Cohen, Louis Sherman, Washington, D. C., Meranze Katz, Spear & Bielitsky, Bernard N. Katz, Philadelphia, Pa., amici curiae, for Building and Construction Trades Department, AFL-CIO and Building and Construction Trades Council of Philadelphia and Vicinity, AFL-CIO.
 John D. Day, Asst. City Sol., Matthew W. Bullock, Jr., First Deputy City Sol., Levy Anderson, City Sol., Philadelphia, Pa., amici curiae, for City of Philadelphia.
 Ralph B. Powell, Jr., Philadelphia, Pa., amicus curiae, for General Building Contractors Ass'n, Inc.
 Guy Farmer, Patterson, Belknap, Farmer & Shibley, Washington, D. C., amici curiae, for National Electrical Contractors Ass'n.
 Before HASTIE, Chief Judge, and McLAUGHLIN and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 The original plaintiff, the Contractors Association of Eastern Pennsylvania (the Association) and the intervening plaintiffs,[1] construction contractors doing business in the Philadelphia area (the Contractors), appeal from an order of the district court which denied their motion for summary judgment, granted the motion of the the federal defendants[2] to dismiss the Association complaint for lack of standing, and granted the cross-motion of the federal defendants for summary judgment.[3] When deciding these motions, the district court had before it the Association's verified complaint, a substantially identical complaint of the Contractors, the affidavits of Vincent G. Macaluso and Ward McCreedy on behalf of the federal defendants which identified certain relevant documents, a stipulation by the parties as to certain facts, and two affidavits of Howard G. Minckler on behalf of the plaintiffs.
 
 
 2
 The complaint challenges the validity of the Philadelphia Plan, promulgated by the federal defendants under the authority of Executive Order No. 11246.[4] That Plan is embodied in two orders issued by officials of the United States Department of Labor, dated June 27, 1969 and September 23, 1969, respectively. Copies of these orders were annexed to the verified complaint as exhibits 1 and 2, respectively, and to the Macaluso affidavit as appendices B and C respectively. In summary, they require that bidders on any federal or federally assisted construction contracts for projects in a five-county area around Philadelphia,[5] the estimated total cost of which exceeds $500,000, shall submit an acceptable affirmative action program which includes specific goals for the utilization of minority manpower in six skilled crafts: ironworkers, plumbers and pipefitters, steamfitters, sheetmetal workers, electrical workers, and elevator construction workers.
 
 
 3
 Executive Order No. 11246 requires all applicants for federal assistance to include in their construction contracts specific provisions respecting fair employment practices, including the provision:
 
 
 4
 "The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin."[6]
 
 
 5
 The Executive Order empowers the Secretary of Labor to issue rules and regulations necessary and appropriate to achieve its purpose. On June 27, 1969 Assistant Secretary of Labor Fletcher issued an order implementing the Executive Order in the five-county Philadelphia area. The order required bidders, prior to the award of contracts, to submit "acceptable affirmative action" programs "which shall include specific goals of minority manpower utilization." The order contained a finding that enforcement of the "affirmative action" requirement of Executive Order No. 11246 had posed special problems in the construction trades.[7] Contractors and subcontractors must hire a new employee complement for each job, and they rely on craft unions as their prime or sole source for labor. The craft unions operate hiring halls. "Because of the exclusionary practices of labor organizations," the order finds "there traditionally has been only a small number of Negroes employed in these seven trades."[8] The June 27, 1969 order provided that the Area Coordinator of the Office of Federal Contract Compliance, in conjunction with the federal contracting and administering agencies in the Philadelphia area, would determine definite standards for specific goals in a contractor's affirmative action program. After such standards were determined, each bidder would be required to commit itself to specific goals for minority manpower utilization. The order set forth factors to be considered in determining definite standards, including:
 
 
 6
 "1) The current extent of minority group participation in the trade.
 
 
 7
 2) The availability of minority group persons for employment in such trade.
 
 
 8
 3) The need for training programs in the area and/or the need to assure demand for those in or from existing training programs.
 
 
 9
 4) The impact of the program upon the existing labor force."
 
 
 10
 Acting pursuant to the June 29, 1969 order, representatives of the Department of Labor held public hearings in Philadelphia on August 26, 27 and 28, 1969. On September 23, 1969, Assistant Secretary Fletcher made findings with respect to each of the listed factors and ordered that the following ranges be established as the standards for minority manpower utilization for each of the designated trades in the Philadelphia area for the following four years:
 
 
 11
 Range of Minority Group Employment
Identification
of Trade Until for for for
 12/31/70 1971 1972 1973
Ironworkers 5%-9% 11%-15% 16%-20% 22%-26%
Plumbers &
 Pipefitters 5%-8% 10%-14% 15%-19% 20%-24%
Steamfitters 5%-8% 11%-15% 15%-19% 20%-24%
Sheetmetal
 workers 4%-8% 9%-13% 14%-18% 19%-23%
Electrical
 workers 4%-8% 9%-13% 14%-18% 19%-23%
Elevator
 construction
 workers 4%-8% 9%-13% 14%-18% 19%-23%
 
 
 12
 The order of September 23, 1969 specified that on each invitation to bid each bidder would be required to submit an affirmative action program. The order further provided:
 
 
 13
 "4. No bidder will be awarded a contract unless his affirmative action program contains goals falling within the range set forth * * * above. * * *
 
 
 14
 * * * * * *
 
 
 15
 6. The purpose of the contractor's commitment to specific goals as to minority manpower utilization is to meet his affirmative action obligations under the equal opportunity clause of the contract. This commitment is not intended and shall not be used to discriminate against any qualified applicant or employee. Whenever it comes to the bidder's attention that the goals are being used in a discriminatory manner, he must report it to the Area Coordinator of the Office of Federal Contract Compliance of the U. S. Department of Labor in order that appropriate sanction proceedings may be instituted.
 
 
 16
 * * * * * *
 
 
 17
 8. The bidder agrees to keep such records and file such reports relating to the provisions of this order as shall be required by the contracting or administering agency."
 
 
 18
 In November, 1969, the General State Authority of the Commonwealth of Pennsylvania issued invitations to bid for the construction of an earth dam on Marsh Creek in Chester County, Pennsylvania. Although this dam is a Commonwealth project, part of the construction cost, estimated at over $3,000,000 is to be funded by federal monies under a program administered by the Department of Agriculture.[9] The Secretary of Agriculture, one of the federal defendants, as a condition for payment of federal financial assistance for the project, required the inclusion in each bid of a Philadelphia Plan Commitment in compliance with the order of September 23, 1969. On November 14, 1969, the General State Authority issued an addendum to the original invitation for bids requiring all bidders to include such a commitment in their bids. It is alleged and not denied that except for the requirement by the Secretary of Agriculture that the Philadelphia Plan Commitment be included, the General State Authority would not have imposed such a requirement on bidders.
 
 
 19
 The Association consists of more than eighty contractors in the five-county Philadelphia area who regularly employ workers in the six specified crafts, and who collectively perform more than $150,000,000 of federal and federally assisted construction in that area annually. Each of the contractor plaintiffs is a regular bidder on federal and federally assisted construction projects. The complaint was filed prior to the opening of bids on the Marsh Creek dam. It sought injunctive relief against the inclusion of a Philadelphia Plan Commitment requirement in the invitation for bids. By virtue of a stipulation that the General State Authority would issue a new and superseding invitation for bids if the district court held the Plan to be unlawful, the parties agreed that bids could be received without affecting the justiciability of the controversy. Bids were received on January 7, 1970. One of the intervening contractor plaintiffs submitted a low bid and appeared at the time of the district court decision to be entitled to an award of the contract.
 
 
 20
 The complaints of the Association and the Contractors refer to the fact that the Comptroller General of the United States has opined that the Philadelphia Plan Commitment is illegal and that disbursement of federal funds for the performance of a contract containing such a promise will be treated as unlawful.[10] The plaintiffs point out that the withholding of funds after a contractor has commenced performance would have catastrophic consequences, since contractors depend upon progress payments, and are in no position to complete their contracts without such payments. They allege that the Philadelphia Plan is illegal and void for the following reasons:
 
 
 21
 1. It is action by the Executive branch not authorized by the constitution or any statute and beyond Executive power.
 
 
 22
 2. It is inconsistent with Title VII of the Civil Rights Act of 1964.[11]
 
 
 23
 3. It is inconsistent with Title VI of the Civil Rights Act of 1964.[12]
 
 
 24
 4. It is inconsistent with the National Labor Relations Act.[13]
 
 
 25
 5. It is substantively inconsistent with and was not adopted in procedural accordance with Executive Order No. 11246.
 
 6. It violates due process because
 
 26
 a) it requires contradictory conduct impossible of consistent attainment;
 
 
 27
 b) it unreasonably requires contractors to undertake to remedy an evil for which the craft unions, not they, are responsible;
 
 
 28
 c) it arbitrarily and without basis in fact singles out the five-county Philadelphia area for discriminatory treatment without adequate basis in fact or law; and
 
 
 29
 d) it requires quota hiring in violation of the Fifth Amendment.
 
 
 30
 The federal defendants moved both to dismiss the complaint under Rule 12(b) (1), Fed.R.Civ.P. and for summary judgment under Rule 56(b), Fed.R.Civ.P. They asserted that the plaintiffs lacked standing and that they were entitled to judgment as a matter of law. The plaintiffs moved for summary judgment. The district court held that the Association lacked standing to maintain the suit, that the Contractors had such standing, and that the Plan was valid, 311 F.Supp. 1002. It granted summary judgment for the federal defendants, and the plaintiffs appeal.
 
 
 Standing
 
 
 31
 The district court's holding that the Association lacked standing to sue was handed down prior to that of the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and in the light of that decision and the more recent decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is at least doubtful. We need not reach this issue, however, since the Contractor plaintiffs who as bidders are directly impacted by the requirement that they agree in their bid to comply with the Plan, clearly have standing. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). All plaintiffs have been represented by the same attorney, and the presence or absence of the Association as a plaintiff has no practical significance.
 
 
 Executive Power
 
 
 32
 The plaintiffs contend that the Philadelphia Plan is social legislation of local application enacted by the Executive without the benefit of statutory or constitutional authority. They point out, probably correctly, that the Plan imposes on the successful bidder on a project of the Commonwealth of Pennsylvania record keeping and hiring practices which violate Pennsylvania law.[14] If the Plan was adopted pursuant to a valid exercise of presidential power its provisions would, of course, control over local law. See United States v. City of Chester, 144 F.2d 415, 420 (3d Cir. 1944); cf. United States v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Panhandle Oil Co. v. State of Mississippi ex rel. Knox, 277 U.S. 218, 221, 48 S.Ct. 451, 72 L.Ed. 857 (1928). But, say the plaintiffs, where there is neither statutory authorization nor constitutional authority for the Executive action, no substantive federal requirements may be imposed upon a contract between the Commonwealth and its contractor.
 
 
 33
 The district court's answer is that the federal government "has the unrestricted power to fix the terms, conditions and those with whom it will deal."[15] For this proposition it cites Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Neither case is in point, however on the issue of Executive as distinguished from federal power. King v. Smith held that the Alabama substitute father regulation was inconsistent with the Social Security Act, 42 U.S.C. § 606(a), and points out that the federal government may impose the terms and conditions upon which its money allotments may be disbursed. The conditions referred to were imposed by Congress, not by the Executive branch. Perkins v. Lukens Steel Co. interprets the Public Contracts Act of June 30, 1936[16] which requires that sellers to the federal government pay prevailing minimum wages. It holds that an administrative determination of prevailing wages in a given industry made by the Secretary of Labor is not subject to judicial review on behalf of a potential seller.[17] The opinion contains the language:
 
 
 34
 "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."[18]
 
 
 35
 The quoted language refers to federal power exercised pursuant to a statutory mandate. The case is not in point on the issue of Executive power absent such a mandate.
 
 
 36
 The federal defendants and several amici[19] contend that Executive power to impose fair employment conditions incident to the power to contract has been upheld in this circuit and in the Fifth Circuit. They cite Farmer v. Philadelphia Electric Company, 329 F.2d 3 (3d Cir. 1964) and Farkas v. Texas Instrument, Inc., 375 F.2d 629 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L. Ed.2d 471 (1967). Both cases discussed the Executive Order program for achieving fair employment in the context of Government contracts rather than federally assisted state contracts, and both assumed the validity of the Executive Order then applicable.[20] Both cases held that even assuming the validity of the Executive Order, it did not give rise to a private cause of action for damages by a party subjected to discrimination. Discussion of the validity of the Executive Order was in each case dictum. Moreover, both Farmer and Farkas refer to 40 U.S.C. § 486(a) as the source of the Executive power to issue the order. That subsection authorizes the President to prescribe such policies and directives as he deems necessary to effectuate the provisions of Chapter 10 of Title 40[21] and Chapter 4 of Title 41.[22] These chapters deal with procurement of Government property and services, not with federal assistance programs. Thus even if Farmer and Farkas were holdings rather than dicta as to Executive power, the holdings would not reach the instant case. The validity of the Executive Order program as applied to the construction industry in state government contracts by virtue of federal assistance has not been litigated, so far as we have been able to determine, in any case reaching the courts of appeals.[23] Certainly no case has arisen which considers Executive power to impose, by virtue of federal assistance, contract terms in a state construction contract which are at variance with state law.
 
 
 37
 The limitations of Executive power have rarely been considered by the courts. One of those rare instances is Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). From the six concurring opinions and one dissenting opinion in that case, the most significant guidance for present purposes may be found in that of Justice Jackson:
 
 
 38
 "We may well begin by a somewhat oversimplified grouping of practical situations in which a President may doubt, or others may challenge, his powers, and by distinguishing roughly the legal consequences of this factor of relativity.
 
 
 39
 1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily on any who might attack it.
 
 
 40
 2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.
 
 
 41
 3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."[24]
 
 
 42
 Plaintiffs contend that the Philadelphia Plan is inconsistent with the will of Congress expressed in several statutes. We deal with these statutory contentions hereinafter. Thus for the moment we may set to one side consideration of Justice Jackson's third category, and turn to category (1), action expressly or impliedly authorized, and category (2), action in which the President has implied power to act in the absence of congressional preemption. To determine into which category the Philadelphia Plan falls a review of Executive Orders in the field of fair employment practices is helpful.
 
 
 43
 The first such order, Executive Order No. 8802,[25] was signed by President Roosevelt on June 25, 1941. It established in the Office of Production Management a Committee on Fair Employment Practice, and it required that all Government contracting agencies include in all defense contracts a covenant not to discriminate against any worker because of race, creed, color, or national origin. The order contained no specific statutory reference, and describes the action "as a prerequisite to the successful conduct of our national defense production effort." In December 1941 Congress enacted "An Act to expedite the prosecution of the war effort,"[26] and on December 27, 1941, pursuant to that Act the President issued Executive Order No. 9001[27] which granted to the War and Navy Departments and the Maritime Commission broad contracting authority. This order among other provisions stated that a non-discrimination clause would be deemed incorporated by reference in all such contracts. On May 27, 1943, Executive Order No. 8802 was amended by Executive Order No. 9346[28] which established in the Office for Emergency Management of the Executive Office of the President a Committee on Fair Employment Practice. This order required the antidiscrimination clause in all government contracts rather than in defense contracts only. Still, the order was quite clearly bottomed on the President's war mobilization powers and was by its terms directed toward enhancing the pool of workers available for defense production.
 
 
 44
 On December 18, 1945, President Truman signed Executive Order No. 9664,[29] which continued the Committee established by Executive Orders No. 8802 and 9346 "for the periods and subject to the conditions stated in the National War Agencies Appropriation Act, 1946 (Public Law 156, 79th Cong., 1st Sess., approved July 17, 1945)." On February 2, 1951, the President signed Executive Order No. 10210,[30] which transferred to the Department of Defense the contracting powers referred to in Executive Order No. 9001. The order continued the provision that a non-discrimination clause would be deemed incorporated by reference in all defense contracts. It referenced the First War Powers Act, 1941, as amended. By a subsequent series of Executive Orders, Executive Order No. 10210 was extended to other Government agencies engaged in defense related procurement.[31] On December 3, 1951 the President signed Executive Order No. 10308,[32] creating the Committee on Government Contract Compliance, which was charged with the duty of obtaining compliance with the non-discrimination contract provisions. The statutory authorities referenced in Executive Order No. 10308 are the Defense Production Act of 1950[33] and 31 U.S.C. § 691.[34] Reference to the Defense Production Act of 1950 shows that the President was still acting, pursuant to his national defense powers, to assure maximum utilization of available manpower.
 
 
 45
 President Eisenhower on August 13, 1953, by Executive Order No. 10479[35] revoked Executive Order No. 10308 and transferred the compliance functions of the Committee on Government Contract Compliance to the Government Contract Committee.[36] In this order for the first time there is no mention of defense production. For the first time the Committee is authorized to receive complaints of violations,[37] and to conduct activities not directly related to federal procurement.[38] On September 3, 1954, by Executive Order No. 10557[39] the required form of Government contract provision was revised. The new provision was much more specific, required the imposition of the contractor's obligation on his subcontractors, and required the posting of appropriate notices. The Eisenhower orders, while they did not refer to defense production and did authorize the Compliance Committee to encourage nondiscrimination outside the field of Government contracts, were still restricted in direct application to federal government procurement. While the orders do not contain any specific statutory reference other than the appropriations statute, 31 U.S.C. § 690, they would seem to be authorized by the broad grant of procurement authority with respect to Titles 40 and 41.[40] No less than in the case of defense procurement it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen. In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category: action pursuant to the express or implied authorization of Congress.
 
 
 46
 Executive Order No. 10925[41] signed by President Kennedy on March 6, 1961, among other things enlarged the notice requirements and specified that the President's Committee on Equal Employment Opportunity could by rule, regulation or order impose sanctions for violation. Coverage still extended only to federal government contracts. Significantly for purposes of this case, however, the required contract language was amended to add the provision:
 
 
 47
 "The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin."[42]
 
 
 48
 The Philadelphia Plan is simply a refined approach to this "affirmative action" mandate. Applied to federal procurement the affirmative action clause is supported by the same Presidential procurement authority that supports the non-discrimination clause generally.
 
 
 49
 The most significant change in the Executive Order program for present purposes occurred on June 22, 1963 when the President signed Executive Order No. 11114,[43] which amended Executive Order No. 10925 by providing that the same non-discrimination contract provisions heretofore required in all federal procurement contracts must also be included in all federally assisted construction contracts. By way of Executive Order No. 11246[44] issued in 1965, President Johnson transferred to the Secretary of Labor the functions formerly specified in Executive Order Nos. 10925 and 11114, and he continued both the affirmative action requirement and the coverage of federally assisted construction contracts.
 
 
 50
 While all federal procurement contracts must include an affirmative action covenant,[45] the coverage on federally assisted contracts has been extended to construction contracts only. This choice is significant, for it demonstrates that the Presidents were not attempting by the Executive Order program merely to impose their notions of desirable social legislation on the states wholesale. Rather, they acted in the one area in which discrimination in employment was most likely to affect the cost and the progress of projects in which the federal government had both financial and completion interests. In direct procurement the federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects. It has the identical interest with respect to federally assisted construction projects. When the Congress authorizes an appropriation for a program of federal assistance, and authorizes the Executive branch to implement the program by arranging for assistance to specific projects, in the absence of specific statutory regulations it must be deemed to have granted to the President a general authority to act for the protection of federal interests. In the case of Executive Order Nos. 11246 and 11114 three Presidents have acted by analogizing federally assisted construction to direct federal procurement. If such action has not been authorized by Congress (Justice Jackson's first category), at the least it falls within the second category. If no congressional enactments prohibit what has been done, the Executive action is valid. Particularly is this so when Congress, aware of Presidential action with respect to federally assisted construction projects since June of 1963, has continued to make appropriations for such projects. We conclude, therefore, that unless the Philadelphia Plan is prohibited by some other congressional enactment, its inclusion as a pre-condition for federal assistance was within the implied authority of the President and his designees. We turn, then to a consideration of the statutes on which plaintiffs rely.
 
 
 The Civil Rights Act of 1964
 
 
 51
 Plaintiffs suggest that by enacting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq, which deals comprehensively with discrimination in employment, Congress occupied the field. The express reference in that statute to Executive Order No. 10925 or any other Executive Order prescribing fair employment practices for Government contractors, 42 U.S.C. § 2000e-8(d), indicates, however, that Congress contemplated continuance of the Executive Order program. Moreover we have held that the remedies established by Title VII are not exclusive. Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971).
 
 
 52
 But while Congress has not prohibited Presidential action in the area of fair employment on federal or federally assisted contracts, the Executive is bound by the express prohibitions of Title VII. The argument most strenuously advanced against the Philadelphia Plan is that it requires action by employers which violates the Act. Plaintiffs point to § 703(j), 42 U.S.C. § 2000e-2 (j):
 
 
 53
 "Nothing contained in this subchapter shall be interpreted to require any employer * * * [or] labor organization * * * to grant preferential treatment to any individual or to any group because of the race * * * of such individual or groups on account of an imbalance which may exist with respect to the total number or percentage of persons of any race * * * employed * * * in comparison with the total number or percentage of persons of such race * * * in the available work force in any community * * * or other area."
 
 
 54
 The Plan requires that the contractor establish specific goals for utilization of available minority manpower in six trades in the five-county area. Possibly an employer could not be compelled, under the authority of Title VII, to embrace such a program, although § 703 (j) refers to percentages of minorities in an area work force rather than percentages of minority tradesmen in an available trade work force. We do not meet that issue here, however, for the source of the required contract provision is Executive Order No. 11246. Section 703(j) is a limitation only upon Title VII not upon any other remedies, state or federal.
 
 
 55
 Plaintiffs, and more particularly the union amici, contend that the Plan violates Title VII because it interferes with a bona fide seniority system. Section 703(h), 42 U.S.C. § 2000e-2(h), provides:
 
 
 56
 "Notwithstanding any other provison of this subchapter, it shall not be an unlawful employment practice for an employer to employ different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system * * *."
 
 
 57
 The unions, it is said, refer men from the hiring halls on the basis of seniority, and the Philadelphia Plan interferes with this arrangement since few minority tradesmen have high seniority. Just as with § 703(j), however, § 703(h) is a limitation only upon Title VII, not upon any other remedies.[46]
 
 
 58
 Plaintiffs contend that the Plan, by imposing remedial quotas, requires them to violate the basic prohibitions of Section 703(a), 42 U.S.C. § 2000e-2(a):
 
 
 59
 "It shall be an unlawful employment practice for an employer —
 
 
 60
 (1) to fail or refuse to hire * * * any individual * * * because of such individual's race * * * or
 
 
 61
 (2) to * * * classify his employees in any way which would deprive * * * any individual of employment opportunities * * * because of such individual's race * * *."
 
 
 62
 Because the Plan requires that the contractor agree to specific goals for minority employment in each of the six trades and requires a good faith effort to achieve those goals, they argue, it requires (1) that they refuse to hire some white tradesmen, and (2) that they classify their employees by race, in violation of § 703(a). This argument rests on an overly simple reading both of the Plan and of the findings which led to its adoption.
 
 
 63
 The order of September 23, 1969 contained findings that although overall minority group representation in the construction industry in the five-county Philadelphia area was thirty per cent, in the six trades representation was approximately one per cent. It found, moreover, that this obvious underrepresentation was due to the exclusionary practices of the unions representing the six trades. It is the practice of building contractors to rely on union hiring halls as the prime source for employees. The order made further findings as to the availability of qualified minority tradesmen for employment in each trade, and as to the impact of an affirmative action program with specific goals upon the existing labor force. The Department of Labor found that contractors could commit to the specific employment goals "without adverse impact on the existing labor force." Some minority tradesmen could be recruited, in other words, without eliminating job opportunities for white tradesmen.
 
 
 64
 To read § 703(a) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history. Clearly the Philadelphia Plan is color-conscious. Indeed the only meaning which can be attributed to the "affirmative action" language which since March of 1961 has been included in successive Executive Orders is that Government contractors must be color-conscious. Since 1941 the Executive Order program has recognized that discriminatory practices exclude available minority manpower from the labor pool. In other contexts color-consciousness has been deemed to be an appropriate remedial posture. Porcelli v. Titus, 302 F. Supp. 726 (D.N.J.1969), aff'd, 431 F.2d 1254 (3d Cir. 1970); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 931 (2d Cir. 1968); Offermann v. Nitkowski, 378 F.2d 22, 24 (2d Cir. 1967). It has been said respecting Title VII that "Congress did not intend to freeze an entire generation of Negro employees into discriminatory patters that existed before the Act." Quarles v. Philip Morris, Inc., supra, 279 F.Supp. at 514. The Quarles case rejected the contention that existing, nondiscriminatory seniority arrangements were so sanctified by Title VII that the effects of past discrimination in job assignments could not be overcome.[47] We reject the contention that Title VII prevents the President acting through the Executive Order program from attempting to remedy the absence from the Philadelphia construction labor of minority tradesmen in key trades.
 
 
 65
 What we have said about Title VII applies with equal force to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. That Title prohibits racial and other discrimination in any program or activity receiving federal financial assistance.[48] This general prohibition against discrimination cannot be construed as limiting Executive authority in defining appropriate affirmative action on the part of a contractor.
 
 
 66
 We hold that the Philadelphia Plan does not violate the Civil Rights Act of 1964.
 
 
 The National Labor Relations Act
 
 
 67
 The June 27, 1969 order, par. 8(b) provides:
 
 
 68
 "It is no excuse that the union with which the contractor has a collective bargaining agreement failed to refer minority employees. Discrimination in referral for employment, even if pursuant to provisions of a collective bargaining agreement, is prohibited by the National Labor Relations Act and the Civil Rights Act of 1964. It is the longstanding uniform policy of OFCC that contractors and subcontractors have a responsibility to provide equal employment opportunity if they want to participate in federally involved contracts. To the extent they have delegated the responsibility for some of their employment practices to some other organization or agency which prevents them from meeting their obligations pursuant to Executive Order 11246, as amended, such contractors cannot be considered to be in compliance with Executive Order 11246, as amended, or the implementing rules, regulations and orders."
 
 
 69
 The union amici vigorously contend that the Plan violates the National Labor Relations Act by interfering with the exclusive union referral systems to which the contractors have in collective bargaining agreements bound themselves. Exclusive hiring hall contracts in the building and construction industry are validated by Section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f). In Teamsters Local 357 v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), the Supreme Court held that the National Labor Relations Board could not proscribe exclusive hiring hall agreements as illegal per se since Congress had not chosen to prohibit hiring halls. It is argued that the President is attempting to do what the Supreme Court said the National Labor Relations Board could not do — prohibit a valid hiring hall agreement. Of course collective bargaining agreements which perpetuate the effects of past discrimination are unlawful under Title VII. Local 189, United Papermarkers & Paperworkers v. United States, supra; United States v. Sheet Metal Workers, Local 36, 416 F.2d 123, 132 (8th Cir. 1969). The findings of past discrimination which justified remedial action in these cases were made in judicial proceedings, however. See 42 U.S.C. § 2000e-5(g). The amici contend that the Assistant Secretary's nonjudicial finding of prior exclusionary practices is insufficient to support the Plan's implied requirement that the contractor look to other sources for employees if the unions fail to refer sufficient minority group members.
 
 
 70
 It is clear that while hiring hall arrangements are permitted by federal law they are not required. Nothing in the National Labor Relations Act purports to place any limitation upon the contracting power of the federal government. We have said hereinabove that in imposing the affirmative action requirement on federally assisted construction contracts the President acted within his implied contracting authority. The assisted agency may either agree to do business with contractors who will comply with the affirmative action covenant, or forego assistance. The prospective contractors may either agree to undertake the affirmative action covenant, or forego bidding on federally assisted work. If the Plan violates neither the Constitution nor federal law, the fact that its contractual provisions may be at variance with other contractual undertakings of the contractor is legally irrelevant. Factually, of course, that variance is quite relevant. Factually it is entirely likely that the economics of the marketplace will produce an accommodation between the contract provisions desired by the unions and those desired by the source of the funds. Such an accommodation will be no violation of the National Labor Relations Act.
 
 
 71
 The absence of a judicial finding of past discrimination is also legally irrelevant. The Assistant Secretary acted not pursuant to Title VII but pursuant to the Executive Order. Regardless of the cause, exclusion from the available labor pool of minority tradesmen is likely to have an adverse effect upon the cost and completion of construction projects in which the federal government is interested. Even absent a finding that the situation found to exist in the five-county area was the result of deliberate past discrimination, the federal interest in improving the availability of key tradesmen in the labor pool would be the same. While a court must find intentional past discrimination before it can require affirmative action under 42 U.S.C. § 2000e-5(g), that section imposes no restraint upon the measures which the President may require of the beneficiaries of federal assistance. The decision of his designees as to the specific affirmative action which would satisfy the local situation did not violate the National Labor Relations Act and was not prohibited by 42 U.S.C. § 2000e-5(g).
 
 
 Consistency with Executive Order No. 11246
 
 
 72
 The plaintiffs argue that the affirmative action mandate of § 202 of Executive Order No. 11246 is limited by the more general requirement in the same section, "The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin." They contend that properly construed the affirmative action referred to means only policing against actual present discrimination, not action looking toward the employment of specific numbers of minority tradesmen.
 
 
 73
 Section 201 of the Executive Order provides:
 
 
 74
 "The Secretary of Labor shall be responsible for the administration of Parts II [Government contracts] and III [federal assistance] of this Order and shall adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof."
 
 
 75
 Acting under this broad delegation of authority the Labor Department in a series of orders of local application made it clear that it interpreted "affirmative action" to require more than mere policing against actual present discrimination.[49] Administrative action pursuant to an Executive Order is invalid and subject to judicial review if beyond the scope of the Executive Order. Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955). But the courts should give more than ordinary deference to an administrative agency's interpretation of an Executive Order or regulation which it is charged to administer. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). The Attorney General has issued an opinion that the Philadelphia Plan is valid,[50] and the President has continued to acquiesce in the interpretation of the Executive Order made by his designee. The Labor Department interpretation of the affirmative action clause must, therefore, be deferred to by the courts.
 
 
 76
 Plaintiffs also contend that the signing of the June 27, 1969 and September 23, 1969 orders by an assistant secretary rather than by the Secretary of Labor makes those orders procedurally invalid. Here they rely on § 401 which provides:
 
 
 77
 "The Secretary of Labor may delegate to any officer, agency, or employee in the Executive branch of the Government, any function or duty of the Secretary under Parts II and III of this Order, except authority to promulgate rules and regulations of a general nature."
 
 
 78
 The Plan, they say, is a rule or regulation of a general nature, and could have been issued only by the Secretary. In the first place the Plan is not general. It is based upon findings as to the available construction manpower in a specific labor market. Moreover, the interpretation of § 401 made by the administrator requires the same deference from the courts as is required toward his other interpretations of the order. We will not second guess his delegation to the Assistant Secretary of the duty of enforcing the affirmative action covenant.
 
 
 The Due Process Contentions
 
 
 79
 Plaintiffs urge that the Plan violates the Due Process Clause of the Fifth Amendment in several ways.
 
 
 80
 First, they allege that it imposes on the contractors contradictory duties impossible of attainment. This impossibility arises, they say, because the Plan requires both an undertaking to seek achievement of specific goals of minority employment and an undertaking not to discriminate against any qualified applicant or employee, and because a decision to hire any black employee necessarily involves a decision not to hire a qualified white employee. This is pure sophistry. The findings in the September 23, 1969 order disclose that the specific goals may be met, considering normal employee attrition and anticipated growth in the industry, without adverse effects on the existing labor force. According to the order the construction industry has an essentially transitory labor force and is often in short supply in key trades. The complaint does not allege that these findings misstate the underlying facts.
 
 
 81
 Next the plaintiffs urge that the Plan is arbitrary and capricious administrative action, in that it singles out the contractors and makes them take action to remedy the situation created by acts of past discrimination by the craft unions. They point to the absence of any proceedings under Title VII against the offending unions, and urge that they are being discriminated against. This argument misconceives the source of the authority for the affirmative action program. Plaintiffs are not being discriminated against. They are merely being invited to bid on a contract with terms imposed by the source of the funds. The affirmative action covenant is no different in kind than other covenants specified in the invitation to bid. The Plan does not impose a punishment for past misconduct. It exacts a covenant for present performance.
 
 
 82
 Some amici urge that selection of the five-county Philadelphia area was arbitrary and capricious and without basis in fact. The complaint contains a conclusive allegation to this effect. No supporting facts are alleged. It is not alleged, for example, that the specific goals for minority manpower utilization would be different if more or fewer counties were to be included in the September 23, 1969 order. The union amici do question the findings made by the Assistant Secretary of Labor, but the complaint, fairly read, does not put these findings in issue. We read the allegation with respect to the five-county area as putting in issue the legal authority of the Secretary to impose a specific affirmative action requirement in any separate geographic area. The simple answer to this contention is that federally assisted construction contracts are performed at specific times and in specific places. What is appropriate affirmative action will very according to the local manpower conditions prevailing at the time.
 
 
 83
 Finally, the plaintiffs urge that the specific goals specified by the Plan are racial quotas prohibited by the equal protection aspect of the Fifth Amendment. See Shapiro v. Thompson, 394 U.S. 618, 641-642, 89 S.Ct. 1322, 22 L.Ed. 600 (1969); Schneider v. Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Philadelphia Plan is valid Executive action designed to remedy the perceived evil that minority tradesmen have not been included in the labor pool available for the performance of construction projects in which the federal government has a cost and performance interest. The Fifth Amendment does not prohibit such action.
 
 
 84
 One final point. The plaintiffs contend that although there were cross-motions for summary judgment the district court, while it should have entered summary judgment in their favor, could not properly enter summary judgment against them. Several amici press this point on appeal even more strenuously than do plaintiffs. They contend that neither the finding of past discrimination by the craft unions made in the June 27, 1969 order nor the statistical findings as to availability of minority tradesmen, employee attrition, and industry growth made in the September 23, 1969 order should be accepted as true.
 
 
 85
 The federal defendants conceded in the district court that the affidavit of Mr. Macaluso, to which copies of both orders were attached, was offered not for the truth of the underlying facts but only to identify the orders. This concession was not significant for the decisions on the motions under Rule 12 (b) (1) and Rule 56(b). The complaint to which the motions by the federal defendants was addressed nowhere challenges the factual underpinnings of the specific goals set forth in the September 23, 1969 order. Rather the complaint makes a legal attack upon the power of the Department of Labor to impose these goals as contractual commitments. Read generously the complaint can be construed to challenge the administrative procedures followed by the Assistant Secretary in determining these goals. We have dealt hereinabove with that challenge insofar as it questions compliance with the procedures specified in Executive Order No. 11246. Insofar as the complaint challenges on broader administrative law grounds the methods by which the Assistant Secretary assembled the data for the September 23, 1969 order, we hold that public hearings after notice were an appropriate means for the administrative agency to obtain the information needed for informed judgment. Cf. Shannon v. Department of Housing & Urban Development, 436 F.2d 809 (3d Cir. 1971). No public hearing was held prior to the issuance of the June 27, 1969 order, which contains the Assistant Secretary's finding of past exclusionary union practices. He relied upon published data, however, which itself may have been sufficient to justify administrative action leading to the specification of contract provisions. We need not decide that issue, however, for in our view the data in the September 23, 1969 order revealing the percentages of utilization of minority group tradesmen in the six trades compared with the availability of such tradesmen in the five-county area, justified issuance of the order without regard to a finding as to the cause of the situation. The federal interest is in maximum availability of construction tradesmen for the projects in which the federal government has a cost and completion interest. A finding as to the historical reason for the exclusion of available tradesmen from the labor pool is not essential for federal contractual remedial action.
 
 
 86
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 James D. Morrissey, Inc.; The Conduit & Foundation Corp.; Glasgow, Inc.; Buckley & Company; The Nyleve Company; Erb Engineering & Constr. Co.; Perkins, Kanak, Foster, Inc.; and Lansdowne Constructors, Inc
 
 
 [2]
 The Secretary of Labor, George P. Shultz; The Assistant Secretary of Labor, Arthur A. Fletcher; The Director, Office of Federal Contract Compliance, John L. Wilks; The Secretary of Agriculture, Clifford M. Hardin
 
 
 [3]
 An additional defendant, the General State Authority of the Commonwealth of Pennsylvania, has not participated in this appeal
 
 
 [4]
 30 Fed.Reg. 12319 (Sept. 24, 1965), as amended by Exec.Order No. 11375, 32 Fed.Reg. 14303 (Oct. 13, 1967), 3 C.F.R. 406 (1969), 42 U.S.C.A. § 2000e note (1970), superseded in part by Exec.Order No. 11478, 34 Fed.Reg. 12985 (Aug. 8, 1969), 3 C.F.R., 1969 Comp. 133, 42 U. S.C. § 2000e note (1970)
 
 
 [5]
 Encompassing Bucks, Chester, Delaware, Montgomery and Philadelphia Counties in Pennsylvania
 
 
 [6]
 § 202(1). This wording comes from Exec.Order No. 11375, see note 4 supra, and represents a minor change from the original designed to parallel the classes of discrimination prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq
 
 
 [7]
 Recognition of this problem antedated the present Plan. Under the Philadelphia Pre-Award Plan, which was put into effect on November 30, 1967 by the Philadelphia Federal Executive Board, each apparent low bidder was required to submit a written affirmative action program assuring minority group representation in eight specified trades as a precondition to qualifying for a construction contract or subcontract. This predecessor Plan was suspended due to an Opinion letter by the Comptroller General stating that it violated the principles of competitive bidding. 48 Comp.Gen. 326 (1968)
 
 
 [8]
 The order of June 27, 1969 listed "roofers and water proofers" among the trades underrepresented by minority craftsmen. The order of September 23, 1969 dropped this category from the list, leaving the six trades previously named
 
 
 [9]
 Federal assistance was authorized under the Watershed Protection and Flood Prevention Act, 16 U.S.C. § 1001 et seq
 
 
 [10]
 Comp.Gen.Op., Letter to Sec. of Labor George P. Shultz, August 5, 1969, 115 Cong.Rec. 17,201-04 (daily ed. Dec. 18, 1969). The Comptroller General had objected to earlier efforts at implementing the "affirmative action" aspect of Exec. Order No. 11246 on the ground that these plans failed to inform prospective bidders of definite minimum standards for acceptable programs. In his negative opinion letter in response to the original Philadelphia Pre-Award Plan, he had also adverted to the possibility of conflict with Title VII of the Civil Rights Act of 1964. See note 7 supra. The Title VII objections became the heart of the opinion of August 5, 1969 which challenged the validity of the Revised Philadelphia Plan
 
 
 [11]
 42 U.S.C. § 2000e et seq
 
 
 [12]
 42 U.S.C. § 2000d et seq
 
 
 [13]
 29 U.S.C. § 151 et seq
 
 
 [14]
 The Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. (Supp.1970), specifically prohibits an employer from keeping any record of or using any form of application with respect to the race, color, religion, ancestry, sex or national origin of an applicant for employment. 43 P.S. § 955(b) (1). The Act also prohibits the use of a quota system for employment based on the same criteria. 43 P.S. § 955(b) (3). The record keeping prohibition may be of limited force due to certain requirements of Title VII of the Civil Rights Act of 1964. 42 U. S.C. § 2000e-8(c). Moreover, we do not know how the Pennsylvania courts or the Pennsylvania Human Relations Commission would react to a scheme of "benign" quota hiring
 
 
 [15]
 311 F.Supp. 1002, 1011 (E.D.Pa.1970)
 
 
 [16]
 49 Stat. 2036-2039, 41 U.S.C. §§ 35-45
 
 
 [17]
 The actual holding ofPerkins was subsequently nullified by Congress. 66 Stat. 308 (1952), 41 U.S.C. § 43a. See 4 K. Davis, Administrative Law § 28.06 (1958).
 
 
 [18]
 310 U.S. at 127, 60 S.Ct. at 876
 
 
 [19]
 Amici favoring the Plan include the City of Philadelphia, the Urban League of Philadelphia, Wives for Equal Employment Opportunity, the Lawyers' Committee for Civil Rights Under Law, and the N.A.A.C.P. Appearing as amici in opposition to the Plan are the Building and Construction Trades Dep't, AFL-CIO, the Building and Construction Trades Council of Philadelphia and Vicinity, AFL-CIO, the General Building Contractors Ass'n, Inc., the National Electrical Contractors Ass'n, and the Associated General Contractors of America
 
 
 [20]
 Exec.Order No. 10925, 26 Fed.Reg. 1977 (March 6, 1961), 3 C.F.R., 1961 Comp. 86
 
 
 [21]
 Management and Disposal of Government Property
 
 
 [22]
 Procurement Procedures
 
 
 [23]
 But cf. Weiner v. Cuyahoga Community College, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970); Ethridge v. Rhodes, 268 F.Supp. 83 (S.D. Ohio 1967)
 
 
 [24]
 343 U.S. at 635-638, 72 S.Ct. at 870-871 (footnotes omitted)
 
 
 [25]
 6 Fed.Reg. 3109, 3 C.F.R., 1938-43 Comp. 957
 
 
 [26]
 Act of Dec. 18, 1941, ch. 593, 55 Stat. 838
 
 
 [27]
 6 Fed.Reg. 6787, 3 C.F.R., 1938-43 Comp. 1054
 
 
 [28]
 8 Fed.Reg. 7183, 3 C.F.R. 1938-43 Comp. 1280
 
 
 [29]
 10 Fed.Reg. 15301, 3 C.F.R., 1943-48 Comp. 480
 
 
 [30]
 15 Fed.Reg. 1049, 3 C.F.R., 1949-53 Comp. 390
 
 
 [31]
 Exec. Order No. 10216, 16 Fed.Reg. 1815 (Feb. 23, 1951), 3 C.F.R., 1949-53 Comp. 732 (Department of Agriculture, Atomic Energy Commission, National Advisory Committee for Aeronautics, and Government Printing Office); Exec. Order No. 10227, 16 Fed.Reg. 2675 (Mar. 24, 1951), 3 C.F.R., 1949-53 Comp. 739 (General Services Administration); Exec. Order No. 10231, 16 Fed.Reg. 3025 (April 5, 1951), 3 C.F.R., 1949-53 Comp. 741 (Tennessee Valley Authority); Exec. Order No. 10243, 16 Fed.Reg. 4419 (May 17, 1951), 3 C.F.R., 1949-53 Comp. 752 (Federal Civil Defense Administration); Exec. Order No. 10281, 16 Fed.Reg. 8789 (Aug. 28, 1951), 3 C.F.R., 1949-53 Comp. 781 (Defense Materials Procurement Agency)
 
 
 [32]
 16 Fed.Reg. 12303, 3 C.F.R., 1949-53 Comp. 837
 
 
 [33]
 50 U.S.C.App. § 2061 et seq
 
 
 [34]
 This latter reference is to the source of appropriations for salaries and expenses for committee members and staff. It appears in numerous subsequent Executive Orders, but has no significance other than fiscal
 
 
 [35]
 18 Fed.Reg. 4899, 3 C.F.R., 1949-53 Comp. 961
 
 
 [36]
 The new committee was composed of 15 members, 9 named by the President and one representative each from the Atomic Energy Commission, the Department of Commerce, the Department of Defense, the Department of Justice, the Department of Labor and the General Services Administration. Id. § 3, as amended by Exec. Order No. 10482, 18 Fed.Reg. 4944 (Aug. 15, 1953), 3 C.F.R., 1949-53 Comp. 968
 
 
 [37]
 Id. § 5
 
 
 [38]
 "Sec. 6. The Committee shall encourage the furtherance of an educational program by employer, labor, civic, educational, religious, and other voluntary non-governmental groups in order to eliminate or reduce the basic causes and costs of discrimination in employment
 "Sec. 7. The Committee is authorized to establish and maintain cooperative relationships with agencies of state and local governments, as well as with non-governmental bodies, to assist in achieving the purposes of this order."
 Id. §§ 6, 7.
 
 
 [39]
 19 Fed.Reg. 5655, 3 C.F.R., 1954-58 Comp. 203
 
 
 [40]
 See 40 U.S.C. § 486(a)
 
 
 [41]
 26 Fed.Reg. 1977, 3 C.F.R., 1959-63 Comp. 448
 
 
 [42]
 Id., pt. III, § 301(1)
 
 
 [43]
 28 Fed.Reg. 6485, 3 C.F.R., 1959-63 Comp. 774
 
 
 [44]
 See note 4 supra
 
 
 [45]
 Section 204 of Exec. Order No. 11246 provides that the Secretary of Labor may exempt certain contracts and purchase orders from the requirements of the order because of special circumstances in the national interest and that he may by rule or regulation exempt certain classes of contracts (1) to be performed outside the United States, (2) for standard commercial supplies or raw materials, (3) involving insubstantial amounts of money or workers, or (4) involving subcontracts below a specified tier
 
 
 [46]
 This same subsection refers to ability tests. The Supreme Court recently in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) considered the extent to which such tests are permissible. The Court said:
 "But Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." 91 S.Ct. at 854.
 It held that the tests must be job related. Nor can seniority make permanent the effects of past discrimination. Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).
 
 
 [47]
 The federal courts in overcoming the effects of past discrimination are expressly authorized in Title VII to take affirmative action. 42 U.S.C. § 2000e-5(g). See Vogler v. McCarty, 294 F. Supp. 368 (E.D.La.1968), aff'dsub. nom. International Ass'n Heat & Frost Insulation & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969).
 
 
 [48]
 Section 604 of Title VI, 42 U.S.C. § 2000d-3, states that nothing in the Title authorizes agency action under the Title with respect to employment practices of any employer, except where federal assistance is primarily aimed at providing employment. However, since the Philadelphia Plan does not purport to derive its authorization from Title VI, this section does not affect its validity
 
 
 [49]
 See United States Commission on Civil Rights, The Federal Civil Rights Enforcement Effort at 167-72 (1970)
 
 
 [50]
 Att'y Gen. Op., Letter to Sec. of Labor Shultz, Sept. 22, 1969, 115 Cong.Rec. 17,204-06 (daily ed. Dec. 18, 1969)