CHAMBER OF COMMERCE OF the UNITED STATES of America, et al., Appellants,

v.

Robert B. REICH, Secretary, U.S. Department of Labor, Appellee.

No. 95–5242.

United States Court of Appeals, District of Columbia Circuit.

May 10, 1996.

Before: SILBERMAN, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

On Petition for Rehearing

SILBERMAN, Circuit Judge:

The government, to bolster its argument that the President's Executive Order is authorized by the Procurement Act notwithstanding any supposed conflict with the National Labor Relations Act, for the first time before us, in its petition for rehearing, points to section 474 of that Act which provides:

[t]he authority conferred by [the Procurement Act] shall be in addition and paramount to any authority conferred by any other law and shall not be subject to the provisions of any law inconsistent herewith. . . .

40 U.S.C. § 474 (1986).

■ It is not surprising that the government did not refer to this section before.[1] The government's suggested interpretation of that language is inconsistent with the government's concession that the President could not issue an Executive Order that caused a conflict with a *prohibition* set forth in the NLRA or in other statutes. *See Chamber of Commerce v. Reich,* 74 F.3d 1322, 1329–30 (D.C.Cir.1996). As the government implicitly recognized, the difficulty with section 474—if given a broad meaning—is that it proves too much; it would allow the President to issue any order that could be thought justified as an implementation of procurement policy, as if no other statutes in the U.S. Codes existed. We think that interpretation of section 474 is quite far-fetched. As appellants in their response to the petition for rehearing observed, it would even raise serious constitutional delegation issues. *See AFL–CIO v. Kahn,* 618 F.2d 784, 793 n. 51 (D.C.Cir.), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979). Furthermore, if Congress intended that any *order* the President issued in furtherance of his procurement authority would actually supersede other federal statutes, that would indicate that Congress anticipated a very tight nexus between such orders and a narrow concept of procurement policy—in other words a broad interpretation of section 474 would undermine the President's authority to impose wage and price controls on federal contractors (recognized in *Kahn*) or to impose equal employment opportunity obligations (recognized by the Third Circuit in *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971)). Section 474 therefore must be interpreted to be limited to, as the legislative history strongly suggests, superseding prior procurement statutes. *See, e.g.,* H.R.Rep. No. 670, 81st Cong., 1st Sess. 27–28, *reprinted in,* 1949 U.S. CODE CONG. SERV. 1475, 1503–04. Indeed, the exceptions listed in section 474 all refer to specific agencies or procurement acts.

■ The government also asserts that our decision is in conflict with our previous *en banc* opinion in *Kahn,* 618 F.2d 784, and the Third Circuit's "Philadelphia Plan" decision, *Contractors Ass'n,* 442 F.2d 159, because we said that, "[n]o state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes . . . ." *Reich,* 74 F.3d at 1337. The government reads our statement as equivalent to the proposition that any governmental action that "affects" collective bargaining is barred by the NLRA. We meant no such thing; the government's interpretation is silly. Virtually any governmental action directed to the national or international economy *affects* collective bargaining. That could include international trade agreements or the decisions of the Federal Reserve Board's Open Market Committee. Obviously the scope of the *Machinists* doctrine, *Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), does not so far extend. But, it does prevent any government action—certainly any action by a government entity other than the NLRB interpreting the NLRA—that is predicated upon (implicitly or explicitly) a substantive policy view as to the appropriate balance of bargaining power between organized labor and management and that attempts to promote a governmental objective by a generic shift in that balance. Such an action is "regulatory" within the meaning of *Machinists* "preemption," *cf. Machinists,* 427 U.S. at 143–44, 149–50, 96 S.Ct. at 2554–55, 2557–58, and is to be distinguished from an *ad hoc* proprietary effort of a government—such as the City of Los Angeles setting a deadline for the termination of a strike causing serious disruptions at a taxicab company under contract with the city. *See Building & Construction Trades*

---

1. The Chamber of Commerce suggests that the government has waived any argument based on section 474, which it relied on in the district court but did not mention in the brief before us. The Chamber of Commerce explains that the government's concession that the *Machinists* preemption doctrine does limit the President's procurement authority if the Executive Order is "regulatory" necessarily undermines any reliance on section 474. At oral argument the court *sua sponte* asked about that section. The Chamber of Commerce pointed out that the government did not rely on it, and the government did not disagree.

*Council v. Associated Builders & Contractors of Massachusetts/Rhode Island,* 507 U.S. 218, 227–28, 113 S.Ct. 1190, 1196, 122 L.Ed.2d 565 (1993) (*Boston Harbor*) (discussing *Golden State Transit Corp. v. Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986)); *Reich,* 74 F.3d at 1337 n. 9.

Although the President's Executive Order upon which we passed in *Kahn* (imposing limitations on wage and price increases for government contractors) undeniably *affected* collective bargaining, it was not *directed* at collective bargaining; it applied to all government contractors whether or not involved in collective bargaining. We therefore said in *Kahn* that "[a]lthough the Executive Order represents an important external factor in the economic environment surrounding collective bargaining, it does not subvert the integrity of that process." 618 F.2d at 796. Echoing the reasoning in *Kahn,* the Supreme Court, in *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 755, 105 S.Ct. 2380, 2397, 85 L.Ed.2d 728 (1985), in upholding Massachusetts' minimum mental-health-care benefits law against a *Machinists* "preemption" challenge, stressed that the law "affect[ed] union and nonunion employees equally." President Clinton's Executive Order, by contrast, is aimed precisely at collective bargaining—and only collective bargaining.

Similarly, Executive Order No. 11,246, requiring government contractors to engage in affirmative action so as to ensure nondiscrimination in employment, at issue in *Contractors Ass'n,* 442 F.2d 159, applied to all government contractors whether or not unionized.[2] Effects on collective bargaining are therefore only incidental to its reach. The union argued in that case that the Department of Labor's remedial order issued pursuant to this Executive Order, which required construction contractors to agree to hiring goals and timetables for minorities heretofore excluded from construction job opportunities, interfered with its hiring hall agreements with contractors. The right to enter into hiring hall agreements, the union emphasized, is guaranteed by section 8(f), 29 U.S.C. § 158(f) (1973), of the NLRA. As

the court pointed out, however, racial discrimination is banned by both Title VII of the Civil Rights Act *and the NLRA itself. See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (union has obligation under NLRA to serve the interests of all its members without discrimination); *see generally* Meltzer, *The National Labor Relations Act and Racial Discrimination: The More Remedies, the Better?,* 42 UNIV.CHI. L.REV. 1 (1974). And collective bargaining agreements cannot act as shields preventing remedial orders designed to prevent discrimination. 442 F.2d at 174–75. The "Philadelphia Plan" was predicated on the Assistant Secretary of Labor's finding of exclusionary practices by unions resulting in the underrepresentation of minorities, which the court equated to discrimination. The maintenance of hiring hall agreements would have perpetuated this underrepresentation.

To be sure, the court stated in *dicta,* which the government emphasizes in its rehearing petition, that "[n]othing in the National Labor Relations Act *purports* to place any limitations upon the contracting power of the federal government." *Id.* at 174 (emphasis added). It is true that the NLRA contains no explicit preemption language. That is the reason why the Supreme Court crafted the *Machinists* and *Garmon* preemption doctrines spelling out the scope of implied preemption and subsequently (after the Third Circuit opinion) applied it to state government procurement. *See Boston Harbor,* 507 U.S. 218, 113 S.Ct. 1190; *Wisconsin Dep't of Indus. v. Gould Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). And the NLRA preemption doctrine, as we indicated, *Reich,* 74 F.3d at 1334, applies equally to the federal government; "preemption" has become a synonym for conflict in the NLRA context. Accordingly, the Third Circuit *dicta* is obviously over broad. If it were correct, the President, by Executive Order, could require government contractors to ignore the rights of employees guaranteed by section 7 of the NLRA. The government conceded at oral

---

**2.** It is worth noting as did the Third Circuit, 442 F.2d at 171, that Congress had for years provid-

ed appropriations to implement the Executive Order.

argument, *see Reich,* 74 F.3d at 1329–30, that the President lacked such power.[3]

\* \* \* \* \* \*

We deny the petition for rehearing.

*So ordered.*

---

**3.** Appellants suggest, in response to the government's rehearing petition, that the distinction between *Kahn* and this case rests on the difference between the *process* of collective bargaining and the *substantive* outcome. The Executive Order in *Kahn* restricted the latter but not the former. We are not persuaded; the process of collective bargaining and the substantive outcome are interrelated. *See Reich,* 74 F.3d at 1337 ("Surely, the result [in *Boston Harbor*] would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law ... requiring all construction contractors ... to enter into collective bargaining agreements ... containing § 8(e) pre-hire agreements."). *Cf. NLRB v. Insurance Agents,* 361 U.S. 477, 490, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *Teamsters Union v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).