**UNIROYAL, INC., Plaintiff,**

**United Rubberworkers of America, AFL–CIO–CLC, Plaintiff Intervenor,**

v.

**Ray MARSHALL, Secretary of Labor and Weldon J. Rougeau, Deputy Assistant Secretary and Director of the Office of Federal Contract Compliance Programs, Defendants,**

**Alta Chrapliwy, Defendant Intervenor.**

**Civ. A. No. 79–1702.**

United States District Court, District of Columbia.

July 20, 1979.

---

Harry N. Turk, Rody P. Biggert, Andrew M. Kramer, Washington, D.C., for plaintiff.

Robert M. Weinberg, James M. Harris, David M. Silberman, Washington, D.C., Charles Armstrong, Akron, Ohio , for plaintiff-intervenor.

David L. Rose, Gerald S. Hartman, Katherine P. Ransel, Louis G. Ferrand, Washington, D.C., for defendants.

Thomas R. Ewald, Washington, D.C., for defendant-intervenor.

## OPINION

HAROLD H. GREENE, District Judge.

This case presents the question whether a major government contractor may be debarred from existing and future government contracts for refusing to comply with demands for discovery in the context of an ongoing proceeding in which it is being charged with employment discrimination. As such, it is a case of first impression. Specifically, the action is one to review an order of the Secretary of Labor terminating plaintiff's present government contracts and declaring plaintiff ineligible for future government contracts, and it seeks an injunction against enforcement of the order.

I

Plaintiff Uniroyal, Inc., is one of the largest manufacturers of rubber and related products in the United States and it employs some 24,000 persons. Since at least 1968, it has had contracts and subcontracts with the United States government in the amount of several million dollars each year. On July 28, 1976, a complaint issued initiating a formal administrative process charging Uniroyal with failure to comply with Executive Order 11246 which prohibits discrimination by government contractors.[1] The complaint alleged that Uniroyal discriminated against its female and minority employees based in its Mishawaka, Indiana, plant. After some discovery was had, Uniroyal advised the government, on May 10, 1977, that it. would no longer comply with the pretrial discovery regulations issued by the Secretary of Labor because it considered them invalid.

Concurrently Uniroyal initiated an action in the U.S. District Court for the Northern District of Indiana challenging the validity of these regulations. That court granted summary judgment to the government (*Uniroyal v. Marshall*, E.P.D. ¶ 7798 (N.D. Ind.1977)), and the U.S. Court of Appeals for the Seventh Circuit affirmed, largely on exhaustion of administrative remedies grounds. *Uniroyal v. Marshall*, 579 F.2d 1060 (7th Cir. 1978).[2]

The government meanwhile filed four motions before the Administrative Law Judge hearing the Uniroyal matter in the Department of Labor seeking to have Uniroyal's government contracts terminated because of its refusal to provide discovery. The first motion alleged that Uniroyal improperly declined to provide full and complete responses to government interrogatories and requests for production of documents and that it refused to permit the

1. Executive Order 11246, which was issued by President Johnson on September 24, 1965, is the latest in a series of such Orders. Three Executive Orders pertaining to fair employment practices were issued by President Franklin Roosevelt; three by President Truman; two by President Eisenhower; and two by President Kennedy. In 1965 President Johnson transferred enforcement of the policy to the Secretary of Labor. For a brief history of the Executive Orders, *see AFL–CIO v. Kahn* (D.C.Cir. No. 79–1564, June 22, 1979) (slip opinion pp. 14– , 15, notes 32, 33).

2. The opinion of the Court of Appeals is discussed in somewhat greater detail below.

government to return to the Mishawaka plant or to inspect and photograph documents there. The second motion was based on Uniroyal's refusal to present its officers and employees for scheduled depositions; the third motion dealt with additional refusals of Uniroyal to respond to requests for admissions and accompanying interrogatories; and the fourth motion alleged that Uniroyal improperly interfered with the government's preparation of its case by interposing interested counsel in interviews by government attorneys of potential witnesses.

Hearings were held on the debarment motions in November 1977. On April 11, 1978, the Administrative Law Judge filed a recommended debarment. In her 21-page opinion, the ALJ found that the government had sustained the first three motions but had waived its rights with respect to the fourth motion. The Secretary of Labor, on June 28, 1979, adopted the ALJ's recommendations save for her ruling on the government's fourth motion, overruled some 43 exceptions filed by Uniroyal, and held that the company had violated the Executive Order and the rules and regulations issued pursuant thereto in the four respects alleged by the government. In accordance with his findings and conclusions, he ordered Uniroyal suspended from all existing contracts "until such time that it can satisfy the Director of the [Office of Federal Contract Compliance Program] that it is in compliance with" the Executive Order and the regulations issued pursuant thereto.

Uniroyal filed this action in this Court on July 2, 1970. After a hearing, the Court stayed execution of the Secretary's debarment order for a period of ten days. On July 12, 1979, a hearing was held on plaintiff's motion for preliminary injunction and the government's motion for summary judgment.[3] At that time, the Court extended the stay for an additional ten days pending its decision on the merits.[4]

This case presents two principal issues[5] first, whether in a proceeding under the Executive Order the contractor may be required to submit to the inspection of records and documents, to answer interrogatories, and to participate in depositions; and second, if a power to compel discovery exists, whether a refusal to comply with discovery may be punished by debarment from government contracts.

## II

■ There can be no serious question about the authority of the Administrative Law Judge under the Executive Order and the regulations to require Uniroyal both to permit the inspection of pertinent documents and records and to require it to participate in depositions and other discovery. At least two of the provisions of the Executive Order establish such power.

Section 202(5) of the Order provides that:

The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

Similarly, section 208(a) grants to the Secretary or his designees the power to "hold such hearings, public or private, as the Secretary may deem advisable for compliance [or] enforcement . . . purposes." Obviously that hearing authority

---

3. The United Rubberworkers of America, AFL–CIO–CLC, were permitted to intervene as a party plaintiff, and Alta Chrapliwy (representing a class of 521 female workers presently and formerly employed in production and maintenance jobs at Uniroyal's Mishawaka, Indiana, plant) was permitted to intervene as a party defendant, and both participated in the hearing.

4. Upon inquiry by the Court, plaintiff indicated that it did not wish to file an opposition to defendants' motion for summary judgment and was prepared to have the Court decide the merits on the basis of the papers previously submitted and the arguments previously made.

5. There are also a number of subsidiary issues which are discussed *infra*.

would be largely meaningless without the concomitant power to compel the production of evidence both from the government and from the contractor who is a party to the hearing. For that reason it may be assumed that, in granting to the Secretary of Labor and his designees in that Department the authority to hold hearings, the President intended to provide them also with the necessary ancillary authority to compel discovery. The regulations implement that construction. See 41 C.F.R. §§ 60–30.9, 30.10, 30.11, 30.15.

Thus, if the Executive Order and the implementing regulations are valid, the discovery ordered by the Administrative Law Judge is likewise valid and binding on plaintiff. The more difficult question on this aspect of the case is whether the President had the authority to promulgate the various discovery provisions of the Executive Order. Examination and analysis of the Executive Order itself and of prior judicial decisions interpreting that Order and other delegations of agency authority compel an affirmative answer.

■ The Executive Order has the force and effect of law. *United States v. New Orleans Public Service, Inc. (NOPSI)*, 553 F.2d 459 (5th Cir. 1977), *vacated and remanded on other grounds*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978); *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159 (3rd Cir. 1971), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967); *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3 (3rd Cir. 1964). Regulations which are promulgated pursuant to the Order likewise have the force and effect of law, provided that they are not inconsistent with the Order or otherwise plainly unreasonable. *Maryland Casualty Co. v. United States*, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1919); *Commissioner v. So. Texas Lumber Co.*, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); *Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra.*

Executive Order 11246 and regulations promulgated pursuant thereto have sur-

vived a number of challenges to their underlying authority similar to that raised in this litigation.

For example, in the *NOPSI* case, *supra*, the court upheld a regulation which provided for the incorporation by reference into government contracts of the equal opportunity clause of the Order, and the court likewise sustained the provisions of section 202(5) of the Order and implementing regulations against a challenge that they authorized unreasonable searches and seizures in violation of the Fourth Amendment. In so ruling, the court noted (553 F.2d at 465) that in determining the validity of regulations under the Order, it was obligated to "give special deference to the Labor Department's interpretation of the Order which that department was charged to administer." *See also United States v. Mississippi Power & Light*, 553 F.2d 480 (5th Cir. 1977).

Similarly, the Executive Order was held to authorize a directive requiring affirmative action goals and timetables for remedying underutilization of minorities under the broad delegation granted to the Secretary of Labor in Section 201 to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof." *Contractors Ass'n of Pa. v. Secretary of Labor, supra.* See also *Southern Illinois Builders Ass'n v. Ogilvie*, 471 F.2d 680 (7th Cir. 1972); *United States v. Duquesne Light Co.*, 423 F.Supp. 507, 510 (W.D.Pa.1976).

In this regard, it is interesting to note that in the previous Uniroyal case (*Uniroyal, Inc. v. Marshall, supra*) the court stated (579 F.2d at 1066–67):

. . . Uniroyal can point to no section of the Order with which those regulations are in explicit conflict. The APA requirement of legal authorization does not clearly require express statutory authority, and the Order gives him broad power both to engage in fact-gathering during the investigative stage to ascertain compliance, and to hold enforcement hearings to prosecute violations discovered during those investigations. For the Secretary

to adopt discovery rules in the gap between an investigation and a hearing does not clearly expand the agency's powers.

While this language cannot be considered dispositive because the decision turned on Uniroyal's failure to exhaust administrative remedies,[6] it does buttress the government's position on this issue.

Plaintiff relies to the contrary on *Federal Maritime Commission v. Anglo-Canadian Shipping Co.*, 335 F.2d 255 (1963), where the Court of Appeals for the Ninth Circuit was faced with the question of the authority of the Federal Maritime Commission to promulgate rules to require common carriers to produce documents for inspection and copying. Answering that question in the negative, the court held, that, absent an explicit congressionally-conferred power to order the production of documents, a federal agency does not possess such authority. In the opinion of that court, general rule-making authority does not suffice.

There are, however, several reasons for concluding that the *Anglo-Canadian Shipping* decision is not controlling or even persuasive.

In the first place, unlike there, the entity which is the subject of the present administrative discovery order is a government contractor. Government contracts have traditionally occupied a special place in the law, and the government has generally been deemed to be vested with far greater powers with respect to such contractors than it is with respect to others, including those merely subject to general administrative regulations. See *infra*. Moreover, there are significant differences between the Merchant Marine Act and the Executive Order.[7] The Act empowered the Commission to issue general rules and regulations and it provided the authority to issue subpoenas duces tecum. It could well be argued, and the court in that case determined, that the general rule-making power was inadequately explicit, and that, to the extent that specific authority was granted, it was limited to a single discovery device— the subpoena duces tecum. By contrast, the Executive Order more expansively and directly requires a contractor (section 202(5) to "furnish all information and reports required by Executive Order 11246 and by the rules, regulations, and orders of the Secretary of Labor . . . for purposes of investigation to ascertain compliance . .," and it further authorizes the Secretary to prescribe reports and procedures for investigations and hearings (sections 203, 206 and 208). Beyond that, the *Anglo-Canadian Shipping* decision has been both considerably undermined and severely criticized in recent years. Thus, in *Federal Communications Commission v. Schreiber*, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), the Court held that a provision of law [8] empowering the FCC to "conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and the ends of justice" gave the Commission wide latitude to conduct its proceedings as it saw fit. 381 U.S. at 289–294, 85 S.Ct. at 1467. The Court went on to state, as it had done previously (*Federal Communications Commission v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940)), that administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."

Other courts, too, have followed this principle in determining the parameters of agency authority. *See also, National Petroleum Refiners Ass'n v. Federal Trade Commission*, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973); *Contractors Ass'n of Eastern Pa. v.*

---

**6.** As indicated *supra*, the action dealt with there was brought while Uniroyal's case was still pending before the Administrative Law Judge.

**7.** In view of its express or implicit ratification by the Congress (see *AFL–CIO v. Kahn, supra,* slip opinion at p. 16), the Executive Order may be said to have quasi-legislative status.

**8.** Section 4(j) of the Communications Act of 1934, as amended 48 Stat. 1068, 47 U.S.C. § 154(j) (1958 ed.).

*Secretary of Labor, supra; United States v. Mississippi Power & Light Co., supra.* For specific criticism of the *Anglo-Canadian Shipping* decision, see Mezines, Stein and Gruff, 4 *Administrative Law* § 23.01[5], 1977; Tomlinson, "Discovery in Agency Adjudication," 1971 Duke L.J. 89 (1971).

 The government's position as to the authority of the Executive Order is further strengthened by the principle, noted above, that its authority with respect to contractors is extensive and that it may set the terms upon which those wishing to deal with it must operate. *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *AFL–CIO v. Kahn, supra,* slip op. at 23; *United States Brewers Ass'n Inc. v. EPA,* 195 U.S.App.D.C. 160, 170, 600 F.2d 974, 984 (D.C.Cir. 1979); *see also King v. Smith,* 392 U.S. 309, 333, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1963). Here, the government, acting through the President's Executive Order and the Secretary of Labor's regulations has determined that one wishing to do business with the government must agree to mutual prehearing discovery. While, to be sure, the government has no power by contract to bind others to abide by invalid regulations,[9] regulations are likely to be regarded as reasonable and valid if they operate in an area where the government has extensive authority, and the field of government contracts is, obviously, such an area. Cf. *Northeast Construction Co. v. Romney,* 157 U.S.App. 381, 485 F.2d 752; *Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra.*

The principal regulations here at issue, moreover, were issued not by a subordinate official but they stem directly from an Executive Order promulgated by the President. That Order has a special status. It has been determined validly to implement the Federal Property and Administrative Service Act of 1949 (FPASA), 40 U.S.C. § 486(a). *Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra,* 442 F.2d at 170; *AFL–CIO v. Kahn, supra,* slip op. at 14–17. The Court of Appeals for this Circuit, in the recent *AFL–CIO* case which validated President Carter's Executive Order establishing voluntary wage and price standards, emphasized the broad discretion possessed by the President under the Act. In that case the court stated that Section 205 of the Act "grants the President particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole. And that direct presidential authority should be used in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency" (footnote omitted).[10] *See also Northeast Construction Co. v. Romney, supra,* 157 U.S. App.D.C. at 389–390, 485 F.2d at 760–61.

In examining the validity of the discovery provisions[11] of the Executive Order and its implementing regulations,[12] it is useful also to note the prevalence of such pretrial procedures throughout the administrative sphere.[13] In fact, as early as 1963, the

9. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Peoples Bank v. Eccles,* 82 U.S.App.D.C. 126, 161 F.2d 636 (1947), *rev'd on other grounds,* 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

10. If, as that court held, the President has the power to establish wage and price guidelines in order to effectuate the purposes of the statute, he can hardly be held to lack the far less intrusive authority to give content and meaning to the government's nondiscrimination policy by requiring mutual prehearing discovery where a contractor has been charged with a violation of that policy.

11. Contrary to plaintiff's contentions, the regulations at issue here are not the equivalent of an exercise of subpoena power for they do not reach third parties. Compare Rules 33, 34, 36 with Rule 45, F.R.Civ.P.

12. The basic authority for the discovery imposed by the ALJ can be found in the Executive Order itself; the regulations merely give detailed content to the provisions of that Order.

13. Other agencies having similar discovery provisions include: Department of Agriculture, 7 C.F.R. 24.21, Rule 12 (1978); Department of Commerce, 15 C.F.R. 3.14–.15 (1978); Energy Research and Development Administration, 10 C.F.R. 3.14–.15 (1978); Federal Communica-

temporary Administrative Conference of the United States, Committee on Compliance and Enforcement, urged federal agencies to adopt as much of the discovery portion of the Federal Rules of Civil Procedure as seemed appropriate.[14] This liberal attitude toward discovery is represented in several recent decisions. *See Smith v. Schlesinger*, 168 U.S.App.D.C. 204, 217–218, 513 F.2d 462, 475–76 (1975) and cases cited.

■ Based upon these considerations, the Court concludes that the applicable Executive Order and the implementing regulations are valid, and that they sustain the validity of the orders of the ALJ and the Secretary which require Uniroyal to produce records and documents, answer interrogatories, and produce personnel for depositions.

### III

■ Plaintiff further argues that, even assuming the discovery regulations to be valid, neither they nor the Executive Order authorize debarment as a sanction for their violation.[15] More specifically, plaintiff claims that the authority to debar found in sections 202(6) and 209(a)(6) extends only to violations of the substantive nondiscrimination provisions of the Order, as distinguished from violations of discovery or inspection orders. That contention is not persuasive for, insofar as the debarment sanction is concerned, the Order makes no such distinction.

A. Section 209 of the Executive Order provides in subsection (a)(5) for the debarment of a contractor who fails "to comply with [equal employment opportunity] provisions of the contract." Those provisions are set forth in section 202,[16] and they contain in provision (4) a requirement that the contractor comply with all rules, regulations, and relevant orders of the Secretary, and in provision (5) requirements that the contractor furnish all information and reports required by the Executive Order and the rules, regulations and orders of the Secretary, and permit access to its books, records, and accounts. Moreover, section 212 provides that the Comptroller General shall be notified when a contractor is debarred "because of noncompliance with the contract provisions [specified in Section 202] . .," not merely, as plaintiff would have it, only because of noncompliance with the substantive provisions of that section.

Subsection (6) of section 202 reaffirms that "[i]n the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any such rules, regulations, or orders . . ." the contractor may be debarred.

The phrase in subsection (6) "such rules, regulations, or orders"—plainly refers to those which the Secretary of Labor is empowered, and indeed required, by section 201 to adopt to achieve the purposes of the Order. The same "rules, regulations, and orders" are repeatedly referred to throughout the Order, e. g., in sections 202(4) ("rules, regulations and relevant orders"),

tions Commission, 47 C.F.R. 1.311–.325 (1977); Federal Trade Commission, 16 C.F.R. 3.31–.38 (1978); General Services Administration, 41 C.F.R. 5A–60, Rule 14 (1977); Department of Interior, 43 C.F.R. 4.115–.116 (1977); United States Postal Service, 39 C.F.R. 955.15–.16 (1977); Department of Transportation, 41 C.F.R. 12–60.212 (1977); and the Veteran's Administration, 38 C.F.R. 1.774, Rules 14–15 (1977).

14. Report of the Committee on Compliance and Enforcement Proceedings in Support of Recommendation No. 30, S.Doc.No. 24, 88th Cong., 1st Sess. at 15 (1963). *See* Bennett, "Post-Complaint Discovery in Administrative Proceedings; the FTC As A Case Study," 1975 Duke L.J. 329 (1975); Tomlinson, *supra*.

15. Debarment is, of course, a significant sanction which may be imposed only for good reason and in accordance with appropriate procedures. *Gonzalez v. Freeman*, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); *Art Metal USA, Inc. v. Solomon*, 25 Contract Cases Federal ¶ 82, 723 (D.D.C. October 6, 1978).

16. The introductory clause to section 202 provides that " . . . all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions . . .," and it may appropriately be concluded that all such provisions are the "equal employment opportunity provisions of the contract."

202(5) ("rules, regulations, and orders"), 202(6) ("such rules, regulations, or orders"), 202(7) ("rules, regulations, or orders"), 202(5) ("implementing rules, regulations or orders") 202(7) ("rules, regulations, or orders"), 202(5) ("implementing rules, regulations or orders"), 208(a) ("rules, regulations, or orders") and 209(a) ("such rules, regulations, or orders"), for a variety of purposes. They clearly refer to *all* rules, regulations, and orders validly promulgated by the Secretary under the Executive Order, and not, as plaintiff contends, to all rules except those regarding discovery procedures.

In this regard, the Court must also consider the purpose of the Executive Order and of the program which it implements. From the very outset and through its various amendments and reenactments the Order was designed, in the context of government contracts, to provide a speedier and more efficacious means of redressing discrimination than was possible through other means, including federal court litigation.[17] Over $100 billion is distributed each year through federal contracts and grants. As was stated in Morgan, "Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained Administrative Process," 1974 Wisc.L.Rev. 301, 303–4 (1974):

> If Blacks truly are guaranteed equal employment opportunities in all federally-funded programs . . . that in itself will be a major start toward equal opportunity in society. If each federal contractor is required to be 'clean' in his nongovernment business as well, the potential impact of an equal opportunity clause will be even greater . . . Achieving social objectives by contract may meet less delay then seeking out and punishing criminally those who violate particular standards . . . It may still be true, however, that compliance with particular standards is easier to achieve when the requirements are made a part of something the contractor wants

and the cost of compliance is borne at least in part by the government.

The government's power with respect to its procurement contracts is broad. Such contracts may be terminated by the government for its convenience, *e. g.,* 41 C.F.R. § 1–8.700 *et seq.,* and contractors may be debarred by the government from receiving further contracts as long as the debarment is effected in accordance with due process and the government's own regulations. To require the government to go to federal court to debar a contractor who is in noncompliance with its contract with the government would not only subvert the process of Executive Order 11246 but turn government contract law on its head.

Plaintiff's claim that the debarment sanction is not authorized for noncompliance with procedural regulations under the Order at either the investigatory or adjudicatory stage of the administrative proceedings runs counter to these purposes. To be sure, the Secretary of Labor may in this respect be able to impose lesser sanctions, such as the exclusion of certain parties or testimony, or the striking of certain claims or defenses. See 41 C.F.R. § 60–30.15(j). However, particularly during the investigatory stage, these options are likely to be unavailable as a practical matter.

During investigations the Department will typically be acting solely based upon single or small groups of employees' complaints of widespread discrimination. Prior to their verification, the government could not, in good faith, allege a pattern or practice of discrimination, nor could such an allegation, if made, rationally serve as an admission by the contractor on account of his failure to supply requested documents. Since the sole means for verifying such complaints is reference to personnel and other employment records of the contractor, access to them is essential if the administra-

---

17. Indeed, the effect of the contract compliance program has been that federal contractors have attained a better record of minority hiring than have non-federal contractors. See the authori-

ties cited in Note, *A Proposal for Reconciling Affirmative Action with Nondiscrimination Under the Contractor Antidiscrimination Program,* 30 Stan.L.Rev. 803 n. 2 (1978).

tive procedure is to advance at all.[18] Yet if plaintiff is correct, the only meaningful sanction that may be employed against a recalcitrant government contractor who refuses such access is to begin the cumbersome and time-consuming process of seeking enforcement of its discovery requests in federal district court.[19] Such a procedure would substantially undermine the purposes and the effectiveness of the Executive Order, and a construction of the Order mandating it should therefore not be adopted unless clearly required. Far from being required under the instant regulatory scheme, such a construction is expressly contradicted by the language of the Executive Order.[20]

Plaintiff additionally claims that the Secretary's own regulations, 41 C.F.R. § 60 *et seq.,* do not authorize debarment. In that respect, plaintiff refers primarily to the fact that section 60–30.15(j) of the regulations does not specifically list debarment as a sanction. That circumstance is inconsequential, however, for the provision does not purport to be exhaustive.[21] There is no reason to include debarment in a section obviously intended to enlarge upon sanc-

tions (such as debarment) which are already authorized elsewhere.[22]

Moreover, other sections of the regulations clearly contemplate the possibility of debarment in the circumstances of this case. Section 60–1.26(a)(1), for example, provides that violations of the Order or the implementing OFCCP regulations "may result in the institution of administrative proceedings" to seek appropriate relief. Once it is determined that the Order or regulations have been violated, appropriate sanctions may be imposed through an administrative enforcement proceeding,[23] and if there is reason to believe that substantial or material violations (or the threat of substantial or material violations) of the contractual provisions of the Order or of the rules, regulations, or orders issued pursuant thereto, have occurred, the matter may either be referred to the Solicitor of Labor to institute administrative enforcement proceedings or to the Department of Justice for court action.[24] Section 60–1.26(a)(2). By including the proviso that "no order for debarment from further contracts or subcontracts pursuant to section 209(a)(6) of the Order shall be made without affording the contractor an opportunity for a hearing,

---

**18.** In this respect, it is important to distinguish this procedure from the typical judicial proceeding in which both sides generally have sufficient knowledge to at least formulate their pleadings.

**19.** Resort to federal court will likely be more expensive and time-consuming than the less formal administrative procedures. Moreover, the agency which is familiar with the case will obviously be in a better position to effect a speedy determination of a claim than will a federal judge who learns of the matter, for the first time, when the enforcement proceeding is begun. To require resort to the courts in connection with every discovery request that is contested would therefore almost inevitably so burden the enforcement program as to undermine its intended simplicity and efficiency.

**20.** Cf. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *United States v. New Orleans Public Service Inc., supra* (Congress deliberately rejected the option of a suit in federal court under Title VII of the Civil Rights Act of 1964 as the exclusive remedy for acts of employment discrimination).

**21.** Section 60–30.15 gives the ALJ "all powers necessary" to conduct a fair hearing and in-

cludes, but is "not limited to," those listed. Section 60–30.15(j) lists the power to "impose appropriate sanctions . . . which *may* include" the three specified sanctions.

**22.** See Section 60–1.26 of the regulations and Executive Order sections 202(4) and (6). The five examples listed in the regulation are the *kinds of sanctions which, in addition to those* authorized elsewhere, may be peculiarly appropriate to the conduct of a fair hearing (such as excluding testimony of an evasive witness or striking certain claims or defenses).

**23.** "OFCCP, notwithstanding the requirements of this chapter, may go directly to administrative enforcement proceedings to enjoin the violations, to seek appropriate relief, and to impose appropriate sanctions, or any of the above." Section 60–1.26(a)(2).

**24.** The Secretary did not abuse his discretion in finding that Uniroyal's patent lack of cooperation and flagrant violation of the discovery rules was "substantial or material", as used in this provision.

either administrative or judicial," this section both sanctions and sets forth the proper procedure for use of the debarment remedy in those circumstances. That procedure was complied with in the instant case.

B. Plaintiff further contends that even if debarment was generally authorized, the Secretary abused his discretion in failing to consider other, lesser sanctions. That argument is not, however, available here.

First, it is clear from the careful consideration which the Secretary gave to this matter, in a 68-page opinion which comprehensively examined Uniroyal's repeated violations, that he regarded debarment to be an appropriate sanction. At issue was more than a casual refusal to comply with a relatively insignificant discovery request. The documents sought by the government from Uniroyal went to the heart of the matters pending before the Administrative Law Judge. Among them were the personnel records of the male and female employees of Uniroyal's plant and the records containing their job descriptions—both obviously necessary for any determination of sex discrimination. Indeed, Uniroyal had refused to provide access to these documents to the government for several years.[25]

Second, Uniroyal's recalcitrance and discriminatory policies had already been the subject of judicial proceedings and had been documented in court opinions. Thus, in *Uniroyal v. Marshall,* the Court of Appeals for the Seventh Circuit had found that (579 F.2d at 1062):

> While the government has responded to Uniroyal's discovery requests, Uniroyal in turn has been largely uncooperative and dilatory. By securing several extensions of time, it delayed its response to the government's request for more than three months. When it did respond, Uniroyal refused to supply large blocks of informa-

tion, contending that the requested information was irrelevant, confidential, beyond the scope of the proceeding, or physically unavailable. The government subsequently procured several orders from the administrative law judge compelling Uniroyal to provide more complete answers. Uniroyal was still unwilling to accommodate, and on May 10, 1977 it raised for the first time the contention that the Secretary of Labor lacked authority to issue the pre-hearing discovery rules.

Likewise, in *Chrapliwy v. Uniroyal, Inc.,* 458 F.Supp. 252 (N.D.Ind.1977), the District Court for the Northern District of Indiana found that Uniroyal, aided and abetted by the United Rubberworker's Union, engaged in massive sex discrimination in violation of Title VII at the very plant under scrutiny here.

■ Under those circumstances it cannot be said that the Secretary abused his discretion in imposing the sanction of debarment instead of some other, lesser sanction, or by not making specific findings with respect thereto.

C. Uniroyal argues with considerable force and conviction that an important public interest is at stake—the right to fair and equal access to the market represented by the various government agencies. It further contends with equal vigor that, while no one has an absolute right to a particular contract, every contractor does have a right not to be debarred, that is blacklisted, from generally retaining or receiving government contracts without good and sufficient reason. That much is certainly true.

However, there is also another public interest involved here, one of equal significance and import. A number of Presidents of the United States, beginning with Franklin D. Roosevelt (see note 1 *supra* ),

---

**25.** It is not significant that the company professes a good faith desire to litigate the legal issue. From the point of view of the government, it has been frustrated in its effort to secure resolution of this discrimination matter for a long period of time. Moreover, as the Court of Appeals for the Seventh Circuit ac-

knowledged in *Uniroyal v. Marshall, supra,* 579 F.2d at 1062, it was not until May 10,. 1977, after Uniroyal had repeatedly thwarted the government's discovery attempts on a number of grounds, that it raised for the first time the contention that the Secretary lacked authority to issue prehearing discovery rules.

have made it a primary national objective that the government shall not buy from those engaged in systematic racial or other improper discrimination. That presidential policy has consistently been endorsed by the Congress, either by express action or by implied consent. Yet it is evident that this policy and program would be nothing more than an empty shell, an abstract statement of principles, unless it is backed by adequate means of enforcement. Effective enforcement, in turn, depends, first, on access to the employment, personnel, and similar records of the contractors; and second, on the availability of meaningful sanctions when such access is denied.

■ What this case, in the end, comes down to is that Uniroyal, through its obdurate refusal to permit adequate inspection and discovery and thus the conduct of full and fair hearings into charges that it is guilty of discrimination, has stalemated the government's effort to seek to verify whether it is or is not dealing with a company which engages in fair employment practices. By that refusal, it left the government with no choice but to terminate its contractual relationships with Uniroyal, and it left the Court with no choice but to uphold that governmental action.

## IV

One final issue remains to be considered. Plaintiff argues that the debarment order is unduly vague, violates due process, and permits arbitrary and capricious action. Actually, it appears that in this respect Uniroyal objects only to that part of the order which debars it from existing and future government contracts "until such time that it can satisfy the Director of OFCCP that it is in compliance with Executive Order 11246." That objection is well taken.

Neither Uniroyal nor the Court has been able to elicit a definitive response as to the meaning of that language. The Court was advised that in order for Uniroyal to be reinstated, the Secretary may well require discovery going beyond that which is the subject of the instant proceeding, and counsel for the government did not exclude the possibility that Uniroyal might be compelled to comply with unspecified substantive requirements—including antidiscrimination measures and various kinds of affirmative action—which may be imposed by the Secretary. The government relies for this broad interpretation upon language in Section 209(a)(5) that "continuance of contracts may be conditioned upon a program for future compliance approved by the Secretary of Labor." See also 41 C.F.R. 60–1.-26 and 60–30.30.

Whatever may be the authority of the Secretary to impose substantive conditions upon a contractor who has been debarred for failing to comply with substantive nondiscrimination provisions of the Executive Order, the Court concludes that he has no such authority where, as here, the contractor was debarred solely for failure to comply with discovery orders. To construe the Executive Order, the regulations, and the Secretary's powers more broadly would raise serious problems of due process and would open the door wide to arbitrary action. The government cannot bootstrap its way from the failure of a contractor to comply with a discovery order to the imposition of substantive affirmative action requirements. Further, a party must be told more than that, in order to be removed from a government blacklist, it must satisfy an administrative official of its compliance with unknown, unspecified, and unpredictable conditions.

■ To be sure, the Secretary could have imposed the sanction of deeming certain allegations of discrimination to be admitted and, based upon those allegations, made a finding of discrimination. But he did not do so here.[26] Inasmuch as Uniroyal was debarred for not complying with the Secretary's prehearing discovery regulations and orders, it is clear that it is entitled to be

---

26. While the Administrative Law Judge did make reference to Uniroyal's practice of maintaining sex-segregated employee folders, and having a sex-based employment classification system (Finding of Fact # 25), she did not recommend debarment on that basis. In any event, the Secretary's adverse decision in this case was not at all based upon findings of discrimination, but solely upon Uniroyal's failure to comply with the discovery orders.

relieved from debarment upon compliance with those same regulations and orders. The remedy of debarment must be coextensive with the violation.

The Court therefore finds that Uniroyal need only remedy the discovery violations found by the Administrative Law Judge [27] to be relieved from debarment.[28] However, unless and until it rectifies those violations by complying in full with the inspection and discovery orders of the Administrative Law Judge, its debarment stands.

---

**27.** With respect to Motion No. 4—which purported to order debarment for Uniroyal's interference with the government's development of its case by interjecting Uniroyal's attorneys in the government's interviews of potential witnesses—the Court is of the opinion that, since there is no way in which Uniroyal may subsequently come into compliance, the Secretary abused his discretion in ordering debarment on that basis. The Executive Order clearly did not intend debarment to be used in a punitive fashion—but rather to induce compliance with the rules promulgated thereunder. See Section 209(a)(6). Where, as here, compliance is no longer possible, the imposition of the debarment sanction is clearly punitive. Moreover, there is a serious question whether on that issue the Secretary's action (which overruled the recommendation of the ALJ) was not substantively arbitrary and unsupported by substantial evidence.

**28.** The Administrative Law Judge found debarment appropriate based solely on these three violations and that finding is amply sustained by the record.